May it please the Court. My name is Saul Huerta from the Office of the Federal Public Defender, and I represent Mr. Avila-Anguiano. I'd like to reserve three minutes for rebuttal, if possible. Your Honor, the main problems in this trial involved the jury instructions, which did not properly guide the jury. The first one that I want to talk about is the alienage instruction, and also the proof of alienage submitted to the jury by the government. The information or the evidence provided as to alienage, although it provided evidence of where the alleged aliens were born, and additionally, where their parents were born, it did not, I believe under 8 U.S.C. 1101 and 8 U.S.C. 1401, provide enough evidence that there wasn't a possibility that the individuals could in fact not be aliens. I explained that in my brief, the basic fact being that even if a person does not know that they're U.S. citizens, because one of the parents might have been, because one of the grandparents may have been a United States citizen, those questions were not asked. But I think the key phrase you used is it might be possible that they were not aliens. But you had evidence that they were they testified that they were born in Mexico, they were citizens of Mexico, their parents were citizens of Mexico. So couldn't a reasonable juror conclude, which is the standard, not was it possibly that they weren't aliens, but couldn't a reasonable juror conclude that they were? Well, I guess, Your Honor, I guess what my response to that would be that we do understand that the place where the person is born is not conclusive of alienage. Otherwise, we wouldn't bother asking where the parents were born, because that wouldn't matter. If, you know, so in theory, I guess, you could say that where they were born might be enough. And, again, it's not a sufficiency question. I'm not arguing, I guess, sufficiency. But didn't they also say that there was testimony that they didn't have legal authorization to be in the U.S.? Correct. That was what they said. And, again, I guess my point was simply that the fact that their parents were not born in the U.S. does not mean that they may in fact not have been United States citizens. Correct. But that's like saying somebody is here today whose parents were born in Russia. They may well be a U.S. citizen. But if they also testified that they were born in Russia, that they were here without authorization and that they weren't citizens, wouldn't that be enough for the jury to say, hmm, I think they might be an alien? Your Honor, that might be the case. I guess we are under plain error review. I guess our contention is that with the person there and available to testify, the additional question that would pretty much cut off any possible citizenship is did your parent ever live in the U.S.? Right. And if the parent never lived in the U.S., there would be no way for transmission of United States citizenship. Did you provide the Court with an instruction saying that just because they were born in Mexico and had Mexican parents, that does not prove that they were aliens? Your Honor, do you mean to the trial court? Yes. I wasn't the trial attorney. I wasn't. Well, I mean, did the defense attorney? Yeah. The defense attorney did not. Did not. Did not. So this is a plain error case, right? That is correct, Your Honor. This is standard review. Yes. Both. Do you have a case that shows as plain error to instruct on the definition of natural born, which is the definition given here? I do not, Your Honor. Your Honor, the second jury instruction, and that is the bringing in question, I would, again, in this one, just, again, it's plain error review because there   of natural born, which is the definition given here. I mean, in this case, the way the instruction was written is it refers to immediate destination, which is a language that in U.S. v. Lopez was found to be incorrect because the offense of bringing in ends when the person is, when the initial transporter basically drops off the person. And in this case, that apparently happened somewhere in southern Arizona prior to arriving at the house where the ---- So you're saying it was completed at the time that they came across the border? Yes, Your Honor. Under Lopez. That's correct. The moment they are dropped off originally. Now, the ---- Well, you said no. Actually, doesn't Lopez make a slightly different, you know, the elements are satisfied upon the crossing of the border and the crime itself terminates once the transporter, the initial transporter drops the person. So here, wouldn't that mean that while the elements of the crime have been completed upon crossing the border, that the crime would terminate upon arrival at the house? And then you're saying your client comes later. Well, Your Honor, it's when the initial transporter finishes. And in this case, the initial transporter left these people in the desert somewhere where they were then picked up by a van. And so the offense then ended once they were dropped off at the desert under Lopez. And so you can only aid and abet the offense up until that point in time. And they were in the desert for a certain length of time. Someone picked them up and brought them to the house. And the government argued both, especially in their closing, about the immediate destination, meaning that the jury could find that the offense of aiding and abetting, excuse me, And so I think that allowed the jury to find Mr. Avila-Anguiano guilty. This is only as to counts four through six. The evidence was that Avila-Anguiano was working at the drop house where these people were found to be held as hostages until payment were made to the coyotes who were bringing them across. OK. Now, why isn't the fact that he is a guard and working in maintaining the drop house an indication that he's aiding and abetting bringing to the United States because the purpose of his being there is to provide some surveillance to the drop house to make it a secure location where to keep these people. In other words, he's a sort of an accessory after the fact where the drop has occurred before the so-called drop house. Well, Your Honor, and that would be a separate offense, accessory after the fact as opposed to aiding and abetting. Why can't he? Why isn't he an aide and abetter if he's an accessory after the fact? Can't an accessory after the fact be an aide and abetter? I don't believe so, Your Honor, because you can only aid and abet the offense until it's completed and only after the offense is completed can you be an accessory after the fact to that offense. What the jury was able to find, the jury could have found, and based on the incorrect jury instruction is that he aided and abetted a completed offense because the jury could have found, and it's hard to tell, there's information here that he lived in Fontana, California. Let's just stop right there. You can't actually aid and abet a completed offense, correct? Right. So really the bellwether here is when was the offense complete? And if it's complete either in the desert upon the dropping off, then he can't aid and abet after the fact, correct? Right. And now the government did argue that there was some evidence, and there is some evidence in the record, that he might have been at the house a few months before from one of the neighbors. There's also evidence that he lived in Fontana, California. That's his own statement that they taped surreptitiously when they were first checking on this. But based on the jury instruction, jurors could have found, could have disbelieved that and still found him guilty because they could have said, well, he was there at the house when they were dropped off. We don't care if he showed up right then and there at the same time as they did or if he'd been there for months and months on end. And so for that reason, we think the jury instruction misguided the jury. So the most you could be liable for would be to be transporting the alien, aiding and abetting transporting the alien once the alien is within the United States, like in Lopez. That's correct. Which is a different offense. Which is a different offense. Right. A different subsection. And, of course, nobody had the benefit of Lopez on all of this. No, Your Honor. I guess you would. They had the contours of it, but we didn't have the precision that we now know. They had the previous. They had Ramirez-Martinez. Right. And I think it's Gonzalez-Gutierrez. I'm sorry. I'm blanking on the other name of the two cases that have come down, which said two different things. One said immediate destination. The other one said right at the point of entry. Right. Thank you.  Good morning. Good morning. Your Honor, what about picking up on that last point that Judge McKeown made, that one can't aid and abet a completed offense. And the most we can say about this defendant is that he, his presence as a maintenance guard in the drop house was aiding and abetting the transporting of these illegals from the point of drop-off to the, what we call the drop house, where they were held as hostages. In other words, counts four through six were improperly instructed in terms of plain error. What's wrong with that argument? What's wrong with that argument is it fails to appreciate the fact that the defendant was working at this house, maintaining a place for these people to bring the illegal aliens to once they got across the border. There's a couple of ways of thinking. Is four through six, are any of those conspiracy counts? They are not conspiracy. They are aid and abet. You know, an easy analogy here is a relay race. Okay? You've got four people at different spots on a track. The starter's gun goes off. The first guy takes off with that baton. The fourth person in the relay is standing there waiting for him. The problem with that is that the relay ends at the finish line. And Lopez tells us the bringing two ends at the first drop-off. But the first guy's... If the relay ended at 100 yards, your analogy would be correct. Well, the alien smuggling operation ends at the alien's ultimate destination in the United States. The bringing two offense is the first leg of the relay. Okay? And so your first person is coming up to the border and crossing the border and stopping somewhere in the desert with these people. Your next person runs the next relay, leg of the relay, in the van. The next people in the relay are the people at the house. They're standing there waiting. And, you know, I looked up the word aid and vet last night. But haven't we decided in Lopez that it's a severable offense? There the lady we held transported from the drop point to another house. And we found that this was not bringing to the United States. It was moving aliens inside the United States. Yes. Now, we're stuck with that, right? We are stuck with it. You are stuck with it. We are to a degree, Your Honor. And I know you sat on the en banc panel and you concurred and wanted to find that it ended at the border. I had a different view of what bringing two was. I thought bringing two was at the border. Yes. And I. Which would be even worse. Even worse for you. No. I don't think it's worse at all, because the evidence in this case is overwhelming that this house was in operation for months before these people crossed the border. Let me just ask this a practical matter. This is why I'm having trouble. It's like this kind of existential thing. The crime, according to Lopez, the crime terminates when they get dropped off in the U.S., correct? That is correct. Okay. But under your theory, everything that happens after that and any individual who might participate in any downstream activity is liable as an aider and abetter. Only if that individual was participating and knew about the offense as it was occurring before the offense ended. And I want to read to you from footnote 19 of the Lopez decision. Contrary to the defense, excuse me, the dissent suggestion, I'm paraphrasing that beginning there, and this is the direct quote, we do not decide that if a smuggling operation, quote, relies on, end quote, a secondary, comma, stateside transporter in the sense that the secondary transporter's agreement to participate induces or encourages the commission of the initial extratorial, quote, brings to, close quote, offense, and the secondary transporter intended to so induce or encourage the commission of the crime, aiding and abetting liability will never lie. Those are not the facts of this case, and we do not consider that question here. I guess maybe the real question is this, is whether in light of Lopez, you know, what Lopez, of course, overruled the immediate destination test of the Ramirez-Martinez, and that really was the premise of this whole case. Correct. We now have a paradigm shift. So why shouldn't the case go back under the new paradigm? Because we're on plain error review here, Your Honor, and the defendant carries the burden of establishing prejudice, and the evidence in this case was overwhelming. If you look at the transcript of the phone call, and I have to apologize. I did not do enough in the brief to highlight this. But if you look at the transcript of that telephone call and compare it to the testimony of the witnesses, voice number two in that transcript, that's the defendant, Mr. Avila-Anguiano, says, we kidnapped them down there. This is on pages 204 and 205 of the supplemental excerpts. They pretty much kidnapped them when they came down. And later on down the page he indicates that he's talking about that happened when they were at a hotel down in Altar. Okay. Then you go to the testimony of Manuel, which is on page 21 of the supplemental excerpts, and he notes that they were deceived that other people got to them in Altar, Sonora, Mexico. Likewise, Miguel, the guides met us in Altar. Santiago said that the guides met them in Altar. These are the uncles of the person who was the sponsor. And Miguel and Santiago's testimony is on pages 112 and 159. Kennedy, your theory is that without Avila-Anguiano manning on a permanent basis the drop house where these people were held hostage, right? Yes. Then they wouldn't have been brought to the spot of the first drop off, and therefore he was aiding and abetting because his presence there gave comfort and security to the criminals who were later found guilty of hostage taking, right? You said that a lot better than I did. Right? Now, but doesn't Lopez tell us that his presence at the ultimate drop house, it's only relevant to moving people within the United States, not bringing to the United States? Lopez expressly reserved that question in footnote 19. That's what you read, right? Yes, footnote 19. They expressly reserved that question. Your evidence that Avila-Anguiano knew that they were coming from Mexico and knew that he was, say, the guardian of the final repository, and therefore they couldn't have started the trip without him being there as a guardian, where's the evidence that he knew they were coming from Mexico? That's that spot in the transcript. 204 and 205 and 21 of the supplemental. As well as pages 112 and 159, corroboration of that statement in the transcripts. And Altar is south of the border significantly. On page 111, Miguel acknowledged that they traveled in a van from Altar to the border and then began walking at the border at Sassabay. May I ask you another question? What if somebody runs a sweatshop in L.A.? And, of course, essential to running the sweatshop is to have people come across the border illegally so they can work there. So somebody brings people across the border. They drop them off in Chula Vista, and they get picked up, they get transported to L.A., and now, voila, they can work in the sweatshop. Is the sweatshop owner guilty of aiding and abetting illegally bringing aliens because they know they're going to be coming across and they know they need them and they're not going to be bringing them across if they can't pay off the fee? So are they guilty, the people in L.A.? Only if they're in a concerted effort with the person who's doing the bringing in. In other words. Is that a conspiracy? Well, it can be a conspiracy as well. You know, one of the things that I think Lopez doesn't acknowledge enough is that people often blur the roles that they play in these different things. One of the witnesses even testified in this case that the guides actually came into the house in Phoenix. That was the witness Santiago. And so, I mean, that as well is in the transcript. And the defense attorney in the case never argued that this offense was complete prior to the people's arrival at the house. Never argued anything other than the defendant was a POIO. There's two alternatives in this case. Well, I mean, it seems if the immediate destination is the test, it would be hard to argue. It may be hard to argue, but he never made any point other than. That was the law. Right. But his argument was Marcial Avila-Anguillano is a POIO who arrived after the material witnesses in this case, two days after they arrived. That was his argument. The jury flatly rejected that argument based on overwhelming evidence from the neighbor, from the material witnesses, from the transcript, the things that were said by the defendant in the transcript to indicate that he was there waiting for these people well before they ever even crossed the border, much less got dropped off in the desert. And, you know, another way to look at this is if you've got a group of people involved in robbing banks and you've got one guy in charge and he organizes it and he tells a couple of people, look, you're going to go rob this bank, and he tells a third person, I want you to wait on the corner of Fourth and Market and you're going to find two people. They're going to come running down the street. This is what they're going to look like. Your job is to get them away from there and get them to a safe location. That man's usually charged with conspiracy, isn't he? And that's the way he's. Certainly conspiracy can cover it. But, again, look at the definition of aid and abet. That person is there to assist, to support, to encourage these people in the action, because without the getaway, without being told that they have this place. But the robbery, but there you would choose, I think you'd charge him with attempted bank robbery, assuming they didn't do it, assuming they didn't complete the offense. It would be attempted robbery and he would be a lookout for the attempted robbery. And the offense is the attempted robbery. But here the offense ended. Let's say in the bank case, and then of course if there was a robbery, if there was a bank robbery, then he would be, I think, convicted or at least charged with aiding and abetting a completed robbery. But here we have a charge that bringing across the border is an actual offense. So it did occur. And the question is when did it end? Well, whether it ends at the border or in the desert a few days later, because they said they walked for three days, without a doubt this house was in operation there to collect the money. And the money is what's going to encourage these guys to do the act. You know, they're not doing this for free. Common sense tells us that. And the money can't be collected until they've held them hostage and they've been paid off by their relatives. So your position is that the defendant here at the drop house holding these people hostage knows where they're coming from and is part and parcel and aiding or abetting and bringing them to the first stop spot. That's correct. What else could you charge them with? Let's say that you're in we didn't appreciate or buy your argument, and that the offense was completed and therefore you can't aid and abet after a completed offense. But they're basically holding people hostage in this house. What else would you charge them with? Well, we obviously did charge them with hostage taking. And we also could have charged harboring and so on. But you reach a point where you start getting a little complicated. And we did things the way we did for a reason, because this was a seamless operation and we wanted to be able to show that. And again, you've got to keep in mind the meaning of aid and abet. It is to encourage somebody to support them, to assist them before the offense is complete. And these people are being assisted and encouraged before the offense is complete by knowing that they're going to be paid, knowing that there's going to be a place for these aliens to go after they get across the border. And so there's two roles that are being played by the defendant at this house to encourage those people before they even act. That's the important part. That part happens before they act. Could I ask another practical question? Sure. If their conviction is affirmed on counts two and three, and if they were retried and acquitted on four through six, what kind of difference would it make in the sentence? Or is that something you know off the top of your head? It could make a difference in the sentence. I will tell you very candidly that the district court judge was looking for a way to sentence these folks. Despite the fact that the guideline for hostage taking resulted in a life sentence calculation, the judge was looking to sentence this particular defendant to less than 15 years, which is what he got. The third count of bringing in triggered a five-year minimum mandatory sentence, which was mandatorily consecutive to the 10-year mandatory sentence under 924C. So, in fact, there is a potential that if this case were reversed and remanded, despite the plain error review here, that it would result in a different sentence if those counts were either dismissed or the defendant were found not guilty. Do you have a minute to rebut? Thank you. You're welcome. And, Your Honor, just briefly, there's also a section, I believe it's page 197 of the government's transcript, but it's page 8 of the government brief. And they talk about Mr. Avilandiano speaks into the phone and talks about how apparently he was also brought across and he had to stay. He wasn't able to leave. It seems to indicate in that conversation, obviously, that he ended up maybe getting into this to pay his own fee or something along those lines. I wasn't at the trial, so I couldn't tell you exactly how it all went. But what that points to is the jury could have found under jury instructions that he was someone who was brought across and couldn't make a payment, so he decided to help out somewhere along the line, maybe right then and there. And that's where he was at the house when the other individuals, when Mr. Alvarez-Lopez, Mr. Hernandez-Lopez. That doesn't help you because even if he was working out his debt, he knew that these people were coming to Maltara and he knew that his presence there was aiding and abetting the completion of the scheme, which was to hold these people hostage until their parents paid off. Well, but the jury might have found that he came into this agreement at the moment that they arrived at the home, meaning after the offense was completed. See, they were allowed to do that under jury instructions. But there was testimony that he'd been there for some months watering the garden and keeping an eye on the place before these people arrived. That was one witness. That was the neighbor. But his testimony, again, this surreptitious phone call that was taped, he didn't know it was being taped, where he seems to indicate, and again it's page eight of the governor's brief, where it seems to indicate, you know, some, you know, we all end up here, some of us end up here, and some of us go on. Some of us let me down. You're arguing the credibility of the evidence, but we can't consider that here. Well, I guess what I'm pointing out is the jury, based on the jury instructions, could have found based on the evidence that he basically aided and abetted a completed offense because there was that lag time. So they could have found that. Okay. And so that's what I wanted to point out. Thank you. Thank you both for your arguments. That concludes this morning. The case of the United States v. Avila-Anguelano is submitted.
judges: Siler McKeown, Bea